**IN THE UNITED STATES DISTRICRT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MICHAEL WIGGINS and TERI STEVENS, individually and for all others similarly situated,

Plaintiffs,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS,

Defendant.

Case No. 2:24-CV-00648-WB

**DEFENDANT'S RENEWED MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Defendant Laboratory Corporation of America Holdings, by and through undersigned counsel, hereby renews its request that the Court enter an order compelling Plaintiffs Michael Wiggins and Teri Stevens to submit their claims to binding arbitration and staying this suit pending the conclusion of any arbitral proceedings. The facts and law in support of the Motion are more fully set forth in the accompanying Memorandum of Law.

WHEREFORE, Defendant respectfully requests that the Court enter the proposed Order granting Defendant's Renewed Motion to Compel Arbitration and Stay Proceedings.

Respectfully submitted,

Date: July 26, 2024

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja (PA Bar No. 332093)
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
Telephone: (267) 675-4667
Fax: (267) 675-4601
Email: jasmeet.ahuja@hoganlovells.com

Allison Holt Ryan (*pro hac vice*)
Adam A. Cooke (*pro hac vice*)
Aidan J. Coleman (*pro hac vice*)
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email: allison.holt-ryan@hoganlovells.com
Email: adam.a.cooke@hoganlovells.com
Email: aidan.coleman@hoganlovells.com

*Counsel for Defendant Laboratory Corporation of America Holdings*

**IN THE UNITED STATES DISTRICRT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHAEL WIGGINS and TERI STEVENS, individually and for all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Defendant. | Case No. 2:24-CV-00648-WB |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S RENEWED MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................1

A. Labcorp Website ....................................................................................1

B. Plaintiffs' Accounts ....................................................................................2

C. Plaintiffs' Consent to the User Agreement ....................................................3

D. Plaintiffs' Assent to the Updated Agreement ....................................................6

E. Plaintiffs' Breach of the User Agreement and Updated Agreement........................8

STANDARD OF REVIEW ....................................................................................9

ARGUMENT ....................................................................................................9

A. Federal Law Favors Enforcing Arbitration Agreements ......................................10

B. The Parties Entered into Valid Agreements to Arbitrate this Dispute...................11

C. Any Dispute About the Scope of the Parties' Agreements to Arbitrate Is for the Arbitrator....................................................................................18

D. Enforcing the Arbitration Agreements Requires a Stay of Proceedings................21

CONCLUSION....................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABEC, Inc. v. Eat Just, Inc.*,
No. 23-1091, 2023 WL 8845237 (E.D. Pa. Dec. 21, 2023)....12

*Allegis Grp., Inc. v. Bero*,
689 F. Supp. 3d 81 (D. Md. 2023)....12

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)....10

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....10

*Bedell v. Carrow*,
No. 20-3804, 2021 WL 229319 (E.D. Pa. Jan. 22, 2021)....20

*Bergenstock v. LegalZoom.com, Inc.*,
No. 13 CVS 15686, 2015 WL 3866703 (N.C. Super. Ct. June 23, 2015)....13, 15

*Bloch v. Bloch*,
693 A.2d 364 (Md. Ct. Spec. App. 1997)....12, 13

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015)....18

*Broomall Operating Co. LP v. Eldridge*,
No. 20-2168, 2021 WL 3910723 (E.D. Pa. Aug. 31, 2021)....13

*Brown v. Fam. Dollar Stores of N.C., Inc.*,
1:21CV977, 2022 WL 3576972 (M.D.N.C. Aug. 19, 2022)....12

*Caimano v. H&R Block*,
No. 23-3272, 2024 WL 3295589 (E.D. Pa. July 3, 2024)....15, 21

*Canteen v. Charlotte Metro Credit Union*,
881 S.E.2d 753 (N.C. Ct. App. 2022)....16, 17, 18

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London*,
584 F.3d 513 (3d Cir. 2009)....10

*Chassen v. Fid. Nat'l Fin., Inc.*,
836 F.3d 291 (3d Cir. 2016)....19

*Clymer v. Jetro Cash & Carry Enters., Inc.*,
334 F. Supp. 3d 683 (E.D. Pa. 2018)....9, 10

*Corpening v. MoneyLion Inc.*,
No. 3:19-cv-00282-FDW-DSC, 2020 WL 13882091 (W.D.N.C. Apr. 22, 2020) ..................15

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)..........................................................................................................11

*Deardorff v. Cellular Sales of Knoxville, Inc.*,
No. 19-2642-KSM, 2022 WL 407396 (E.D. Pa. Feb. 9, 2022) .......................................18, 19

*Defillipis v. Dell Fin. Servs.*,
No. 3:14-CV-00115, 2014 WL 4198015 (M.D. Pa. Aug. 22, 2014) ......................................15

*Dillon v. BMO Harris Bank, N.A.*,
173 F. Supp. 3d 258 (M.D.N.C. 2016) .................................................................................13

*Dobbs v. Health IQ Ins. Servs., Inc.*,
No. 21-5276, 2022 WL 2974713 (E.D. Pa. July 27, 2022) ....................................................15

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) ...................................................................................13, 14

*Eisenberry v. Shaw Bros.*,
421 F. App'x 239 (3d Cir. 2011) ..............................................................................................9

*Gay v. CreditInform*,
511 F.3d 369 (3d Cir. 2007)...........................................................................................12, 16

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,
716 F.3d 764 (3d Cir. 2013) ....................................................................................................9

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019)............................................................................................................11

*Hine v. LendingClub Corp.*,
No. 2:22-CV-00362-CRE, 2023 WL 8113234 (W.D. Pa. Nov. 22, 2023).............................14

*Huber v. Taylor*,
469 F.3d 67 (3d Cir. 2006)......................................................................................................12

*Iezzi v. CrossCountry Mortg., LLC*,
No. 23-2827, 2024 WL 37951 (E.D. Pa. Jan.3, 2024).............................................................19

*Johnston Cnty. v. R.N. Rouse & Co.*,
414 S.E.2d 30 (N.C. 1992)......................................................................................................12

*Kai Peng v. Uber Techs., Inc.*,
237 F. Supp. 3d 36 (E.D.N.Y. 2017) .....................................................................................18

*Keena v. Groupon, Inc.*,
192 F. Supp. 3d 630 (W.D.N.C. 2016) ....................16

*Kirkham v. TaxAct, Inc.*,
No. 23-3303, 2024 WL 1143481 (E.D. Pa. Mar. 15, 2024) ....................11, 15, 21

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009)....................9, 11

*Kruzits v. Okuma Mach. Tool, Inc.*,
40 F.3d 52 (3d Cir. 1994)....................11

*Li v. Georges Media Grp., LLC*,
No. 23-1117, 2024 WL 1550368 (E.D. La. Mar. 7, 2024) ....................18

*Lloyd v. Hovensa, LLC*,
369 F.3d 263 (3d Cir. 2004)....................11, 21

*Lyles v. Chegg, Inc.*,
No. RDB-19-3235, 2020 WL 1985043 (D. Md. Apr. 27, 2020) ....................14

*Mack v. Progressive Corp.*,
No. 23-2430, 2024 WL 1120377 (E.D. Pa. Mar. 14, 2024) ....................11

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................9

*Matthews v. Gucci*,
No. 21-434-KSM, 2022 WL 462406 (E.D. Pa. Feb. 15, 2022) ....................12

*Moreno v. Expedia*,
No. 3:18-CV-105, 2018 WL 3059617 (W.D.N.C. June 20, 2018)....................13, 15, 16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)....................10, 19

*Pickett v. Lyft, Inc.*,
No. 20-6389, 2022 WL 1557667 (E.D. Pa. May 16, 2022) ....................13

*Plazza v. Airbnb, Inc.*,
289 F. Supp. 3d 537 (S.D.N.Y. 2018)....................18

*Provenzano v. Ohio Valley Gen. Hosp.*,
121 A.3d 1085 (Pa. Super. Ct. 2015)....................12

*Ratliff v. CoStar Realty Info., Inc.*,
No. 11-0813, 2011 WL 2680585 (D. Md. July 7, 2011) ....................13

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010) ......................................................................................10

*Richardson v. Coverall N. Am., Inc.*,
811 F. App'x 100 (3d Cir. 2020) ......................................................................18

*Sarah Car Care, Inc. v. LogistiCare Sols., LLC*,
No. 21-1761, 2024 WL 100199 (E.D. Pa. Jan. 9, 2024).....................................18, 19

*Smith v. Spizzirri*,
601 U.S. 472 (2024)......................................................................................10, 21

*T.M.C.S., Inc. v. Marco Contractors, Inc.*,
780 S.E.2d 588 (N.C. Ct. App. 2015)................................................................12

*Trippe Mfg. Co. v. Niles Audio Corp.*,
401 F.3d 529 (3d Cir. 2005)............................................................................11

*Zeller-Landau v. Sterne Agee CRT, LLC*,
No. 17-3962, 2018 WL 334970 (E.D. Pa. Jan. 9, 2018)........................................20

**Statutes**

9 U.S.C. § 1 .....................................................................................................1

9 U.S.C. § 2 .....................................................................................................10

9 U.S.C. § 3 .....................................................................................................10, 21

9 U.S.C. § 4 .....................................................................................................10

18 U.S.C. § 2510.................................................................................................8

28 U.S.C. § 1404(a) ............................................................................................1

**Rules**

Fed. R. Civ. P. 56..............................................................................................9

**Other Authorities**

Consumer Rules of the American Arbitration Association,
Rule R-14(a)....................................................................................................4, 19

Defendant Laboratory Corporation of America Holdings ("Labcorp"), by and through undersigned counsel, submits this Memorandum of Law in Support of its Renewed Motion to Compel Arbitration and Stay Proceedings ("Motion"). For the reasons set forth below, Labcorp respectfully moves the Court to order Plaintiffs Michael Wiggins and Teri Stevens to submit the claims set forth in their Class Action Complaint ("Complaint" or "Compl."), ECF No. 2, to individual arbitration and stay this litigation pending the conclusion of those proceedings, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA").[1]

## INTRODUCTION

Plaintiffs admit that they each created accounts on Labcorp's website patient portal. To do so, Plaintiffs accepted Labcorp's user agreement, which contained an arbitration clause, class action waiver, and change-of-terms provision. Plaintiffs further admit that they logged into their Labcorp accounts on or after May 9, 2023, at which time they were notified of revisions to the user agreement. The updated agreement again contained an arbitration provision and class action waiver, as well as a required pre-arbitration informal dispute resolution process. Plaintiffs continued to access their Labcorp accounts, reaffirming the terms of the parties' agreements. There is no dispute of material fact that each Plaintiff agreed to arbitrate their claims, and the Court should compel Plaintiffs to honor their agreements, ordering Plaintiffs' claims to be submitted to individual arbitration and staying this action pending completion of arbitration proceedings.

## BACKGROUND

### A. Labcorp Website

Labcorp is a leading provider of clinical laboratory services. Compl. ¶ 12. Labcorp

[1] In the event that the Motion is denied and its appeal rights are exhausted, Labcorp reserves all rights to seek transfer of this suit to the United States District Court for the Middle District of North Carolina, pursuant to 28 U.S.C. § 1404(a), and to seek dismissal of Plaintiffs' claims.

operates a public-facing website, https://www.labcorp.com/, through which patients can access Labcorp's patient portal, https://patient.labcorp.com/, ("Labcorp Patient," and collectively with https://www.labcorp.com, "the Website"), that enables patients to schedule tests, review test results, and pay bills. *Id.* ¶¶ 12, 43-53, 70, 76. Users can register for an account on Labcorp Patient. *See id.* ¶ 43; Declaration of Lori Crozier ("Crozier Decl.") ¶ 2. To do so, Labcorp patients must provide certain information, such as their name and email address, and they must affirmatively indicate that they have read, understood, and agreed to terms governing their access to and use of the Website, as discussed, *infra*. *See* Crozier Decl. ¶¶ 4-11.

**B. Plaintiffs' Accounts**

Plaintiff Stevens admits that she created a Labcorp Patient account in December 2019. *See* Ex. A (Plaintiff Stevens' Response to Request for Admission) ¶ 2. Plaintiff Wiggins admits that he created a Labcorp Patient account in January 2022. *See* Ex. B (Plaintiff Wiggins' Response to Request for Admission) ¶ 2. Consistent with these admissions, Plaintiffs allege that they have used the Website to "schedule appointments, request information on specific medical services, view test results, access [their] doctor's notes, and make payments for medical services." Compl. ¶¶ 13, 14. They further allege that "an existing patient who visited Labcorp's website to schedule an appointment would first click the 'Patient Login' button at the top of Labcorp's home screen." *Id.* ¶ 43. And just two paragraphs later, the Complaint purports to show that Plaintiff Stevens was logged into her account when allegedly trying to schedule an appointment. *Id.* ¶ 45.

These core admissions and allegations are confirmed by Labcorp's internal business records. Labcorp maintains logs that record when "a user creates an account and also when a user accesses their account and takes some other action, such as viewing test results." Crozier Decl. ¶ 5. Labcorp's logs confirm that both Plaintiffs created accounts, which they have each maintained

for multiple years to utilize Labcorp's online services. *See id.* ¶¶ 5-9; *see also* Ex. C (Stevens Database Logs); Ex. D (Wiggins Database Logs); Ex. E (Stevens Patient Admin); Ex. F (Wiggins Patient Admin). Specifically, Plaintiff Stevens created an account on December 28, 2019, and Plaintiff Wiggins created an account on January 12, 2022. Crozier Decl. ¶¶ 8-9; *see also* Ex. C (reflecting "REGISTRATION_SUCCESS" entry on December 28, 2019); Ex. D (same on January 12, 2022). Both accounts have remained active, and Plaintiffs accessed their accounts on several occasions in the months immediately preceding the filing of this action. Crozier Decl. ¶¶ 8-9, 20-22. Indeed, both Plaintiffs accessed their accounts as recently as February 2024. *See* Ex. G (Stevens Splunk Log); Ex. H (Wiggins Splunk Log). Plaintiffs have not produced any evidence to the contrary.

### C. Plaintiffs' Consent to the User Agreement

Although Plaintiffs created their Labcorp Patient accounts approximately two years apart, their sign-up experience was substantively the same. To register for the accounts, both Plaintiffs provided certain information, such as their name, address, phone number, and an email address. *Compare* Ex. I (December 28, 2019 Registration Page) *with* Ex. J (January 12, 2022 Registration Page). Critically, both Plaintiffs affirmatively checked a box confirming that they "read, understand, and agree to the LabCorp Terms of Use and Web Privacy Statement." *Id.* After checking this box, each Plaintiff completed the account registration process by clicking a separate "Create an Account" button, which appeared on the page. *Id.*; *see also* Crozier Decl. ¶¶ 10-11.[2]

At all relevant times, the phrases "Terms of Use" and "Web Privacy Statement" were offset in blue font, contrasting with the white background and surrounding black text, which made them

---

[2] Plaintiff Stevens was again given notice of and manifested her assent to the User Agreement, including its arbitration provision, when she scheduled an appointment after February 2022. *See* Crozier Decl. ¶¶ 12-13; Ex. K (Stevens Appointment Log); Ex. L (Screenshots of Appointment Scheduling Process).

distinct and indicated that they were clickable hyperlinks. *See* Ex. I (December 28, 2019 Registration Page); Ex. J (January 12, 2022 Registration Page). The hyperlinked "Terms of Use" was designed to present users with Labcorp's then-operative user agreement ("User Agreement"), Crozier Decl. ¶ 14, which, among other things, included an arbitration provision and class action waiver, as well as reserved to Labcorp the right to amend the agreement's terms consistent with the manner contemplated by the User Agreement's change-of-terms provision. *See* Ex. M (December 28, 2019 User Agreement); Ex. N (January 12, 2022 User Agreement).

The User Agreement prominently notified Plaintiffs that assenting to its terms obligated them to arbitrate disputes with Labcorp. Indeed, the third introductory paragraph previewed—in bold and enlarged text—that "**Section 14 of this Agreement contains a mandatory arbitration provision that requires the use of arbitration on an individual basis**[.]" Ex. M (December 28, 2019 User Agreement); Ex. N (January 12, 2022 User Agreement).

Section 14 of the User Agreement set forth in detail the parties' mutual obligation that "any dispute, claim or controversy arising out of or relating in any way to this Agreement or the Patient Portal shall be finally decided by binding arbitration under the Consumer Arbitration Rules of the American Arbitration Association." *Id.* § 14 (emphasis omitted).[3] The arbitration provision also contained a class action waiver, which provided that account holders (such as Plaintiffs) and Labcorp each agreed that they could "bring claims against the other only in [their] or its individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding." *Id.* (emphasis omitted).

[3] Notably, the Consumer Rules of the American Arbitration Association ("AAA Rules") empower the arbitrator to resolve any disputes regarding the scope of the parties' arbitration agreement. Rule R-14(a) provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* Ex. O (AAA Rules), at 17.

The User Agreement also contained a change-of-terms provision. *Id.* § 3. Under this provision, the parties agreed that Labcorp could amend the User Agreement and that such amendment would become "effective immediately upon providing notice of the changes to" account holders when they logged into their account. *Id.* Specifically, account holders "agree[d] to comply with, and be bound by, the modified Agreement" either by (i) "continuing to use or access the Patient Portal after receiving notice of the changes as described above" or (ii) "not requesting to terminate your Patient Portal account within seven (7) calendar days after receiving a notice of the changes[.]" *Id.*

In addition, the User Agreement incorporated by reference the then-operative "Terms and Conditions," Crozier Decl. ¶ 15, which "govern[] access to and use of websites and online applications operated by Labcorp[.]" Ex. M (December 28, 2019 User Agreement); Ex. N (January 12, 2022 User Agreement). The phrase "Terms and Conditions" was offset in blue font as a clickable hyperlink. *Id.* The hyperlink was designed to lead the account holder to the then-operative Terms and Conditions, which contained, at all relevant times, a choice-of-law provision. *See* Crozier Decl. ¶ 15; Ex. P (December 28, 2019 Terms and Conditions) § 21; Ex. Q (January 12, 2022 Terms and Conditions) § 22. That provision specified that account holders "agree that the statutes and laws of the State of North Carolina, without regard to any principles of conflicts of law, will apply to . . . all matters relating to your access to or use of the Online Services." Ex. P (December 28, 2019 Terms and Conditions) § 21; *see also* Ex. Q (January 12, 2022 Terms and Conditions) § 22 (same).[4]

[4] The Terms and Conditions defined "Online Services" to include "www.labcorp.com and all other websites and online applications operated by" Labcorp. Ex. P (December 28, 2019 Terms and Conditions) § 21; Ex. Q (January 12, 2022 Terms and Conditions).

**D. Plaintiffs' Assent to the Updated Agreement**

On May 9, 2023, Labcorp published a revised version of the User Agreement on the Website (the "Updated Agreement"), which contained three provisions relevant here. *See* Crozier Decl. ¶ 17; *see also* Ex. R (Updated Agreement). *First*, the Updated Agreement again included an arbitration clause and class action waiver. The arbitration clause was previewed at the top of the Updated Agreement in bold text, covering "any dispute, claim, or controversy" between Labcorp and Labcorp Patient account holders, "including any past, currently pending, existing, or future dispute or disagreement," with certain exceptions not at issue in this case. Ex. R (Updated Agreement) § 13.

*Second*, the arbitration clause included a pre-arbitration, informal dispute resolution process, requiring any party that seeks to initiate arbitration proceedings to first "notify the other in writing of any dispute so that the parties can attempt in good faith to resolve the dispute informally." *Id.* In the event that Labcorp and the individual could not "agree how to resolve the dispute within 45 days after the notice is received by the other party," either party could proceed by "commenc[ing] an arbitration proceeding[.]" *Id.*

*Third*, the Updated Agreement again incorporated by reference the then-controlling "Terms and Conditions," Crozier Decl. ¶ 18; Ex. R (Updated Agreement). Like the User Agreement, the Updated Agreement offset the phrase "Terms and Conditions" in blue font to indicate that the text was a clickable hyperlink. Ex. R (Updated Agreement). The hyperlink was designed to lead the account holder to the Terms and Conditions, which contained, among other things, the same choice-of-law provision set forth in the earlier versions of the Terms and Conditions described above. *See* Crozier Decl. ¶ 18; Ex. S (May 2023 Terms and Conditions) § 23.

In addition to publishing the Updated Agreement on the Website itself, Labcorp communicated the Updated Agreement to account holders. When account holders accessed their accounts for the first time on or after May 9, 2023, a pop-up message (the "Pop-Up") appeared. *See* Crozier Decl. ¶ 19; Ex. T (Pop-Up Representation). As shown in the graphic below, account holders who logged into their accounts after the Updated Agreement was published were presented with a notice alerting them of an "IMPORTANT UPDATE" related to "Changes to [Labcorp's] Patient Portal User Agreement." Ex. T (Pop-Up Representation). Below that notification, the Pop-Up advised that account holders can "review the modified agreement anytime on [Labcorp's] website." *Id.* Account holders could review the Updated Agreement by clicking the "Review Agreement" button, which appeared directly underneath this notice in a distinct blue color. *Id.* Or, in the alternative, they could close the Pop-Up by clicking the "X" in the top-right corner. *Id.* Until they affirmatively selected one of those options, account holders could not take further action on Labcorp Patient. Crozier Decl. ¶ 19.




**Ex. T**: Pop-Up Representation

Both Plaintiffs admit, and Labcorp's records confirm, that they accessed their accounts after the Pop-Up was transmitted to existing account holders. *See* Ex. A (Plaintiff Stevens Response to Request for Admission) ¶ 3; Ex. B (Plaintiff Wiggins Response to Request for

Admission) ¶ 3; *see also* Ex. C (Stevens Database Log); Ex. D (Wiggins Database Log). Plaintiff Stevens did so on May 12, 2023. Crozier Decl. ¶ 20. Accordingly, she was presented with the Pop-Up no later than that date. *Id.* She accessed her account on five additional occasions in May 2023 alone, *see* Ex. C (Stevens Database Log), and she continued to do so several times over the following months, including as recently as February 6, 2024, *see* Ex. G (Stevens Splunk Log). Plaintiff Wiggins accessed his account on November 30, 2023, and, not later than that date, was presented with the Pop-Up. *See* Crozier Decl. ¶ 21; Ex. D (Wiggins Database Log). Plaintiff Wiggins continued to access his account on multiple occasions after that date, including as recently as February 13, 2024. *See* Ex. H (Wiggins Splunk Log). Neither Plaintiff could have continued to use their accounts on or after May 9, 2023, without being given notice of the Updated Agreement via the Pop-Up. *See* Crozier Decl. ¶ 19.

### E. Plaintiffs' Breach the User Agreement and Updated Agreement

Instead of pursuing arbitration as required by the User Agreement and Updated Agreement, Plaintiffs filed this putative class action on February 13, 2024, purportedly on behalf of "thousands of other [Labcorp] patients" who used the Website. Compl. ¶ 1; *see also id.* ¶ 2. Neither Plaintiff notified Labcorp of their intention to initiate this suit, worked with Labcorp to try to resolve the dispute informally, or initiated arbitration proceedings.

In the Complaint, Plaintiffs allege that Google Analytics transmitted "existing patient[s']" interactions with Labcorp Patient, such as when patients log-in to their Labcorp accounts or schedule appointments for testing services. *Id.* ¶ 43; *see also id.* ¶¶ 44-45, 49-53. Based on these allegations, Plaintiffs assert a claim under the federal wiretap statute, 18 U.S.C. § 2510, and a host of common law claims. *See* Compl. ¶¶ 142-93.

Consistent with the parties' agreements, Labcorp moved to arbitrate this dispute soon after it was filed. *See* ECF No. 18. The Court denied that motion without prejudice to Labcorp renewing its request following a period of limited discovery, which concluded on June 26, 2024. *See* ECF No. 19; ECF No. 31. This renewed motion follows.

## STANDARD OF REVIEW

Where, as here, the parties have completed a period of "limited discovery" regarding the issue of arbitrability, a motion to compel arbitration is evaluated under the "summary judgment standard" set forth in Fed. R. Civ. P. 56. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 775 (3d Cir. 2013). Under that standard, arbitration is required when there is "no genuine issue of fact concerning the formation of the agreement" to arbitrate. *Kirleis v. Dickie McCamey & Chilcote., P.C.*, 560 F.3d 156, 159 (3d Cir. 2009) (citation omitted). Although the Court draws "'reasonable inferences in favor of the nonmoving party,'" *Eisenberry v. Shaw Bros.*, 421 F. App'x 239, 241 (3d Cir. 2011) (citation omitted), the nonmoving party "must 'go beyond the pleadings' and 'show that there is a genuine issue for trial'" regarding the validity of the parties' arbitration agreement. *Clymer v. Jetro Cash & Carry Enter., Inc.*, 334 F. Supp. 3d 683, 689 (E.D. Pa. 2018) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## ARGUMENT

Each Plaintiff entered into a valid arbitration agreement with Labcorp when they created Labcorp Patient accounts. They reaffirmed their agreements after May 2023 when they were given notice of and assented to updated terms. The consequence of their agreements is plain: (i) Plaintiffs must pursue any disputes with Labcorp on an individual basis in arbitration proceedings; and (ii) the arbitrator, rather than the Court, must address the scope of the agreements. Accordingly,

pursuant to the FAA, Labcorp respectfully requests that the Court order Plaintiffs to arbitrate their claims and stay this action pending completion of individual arbitration proceedings.

### A. Federal Law Favors Enforcing Arbitration Agreements

Section 2 of the FAA requires that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity[.]" 9 U.S.C. § 2. Where one party ignores its obligation to arbitrate, the other party may petition a court for "an order directing that . . . arbitration proceed in the manner provided for in [the parties'] agreement." *Id.* § 4. When such a petition is made, the FAA directs that courts "shall" stay the action until the "arbitration has been had in accordance with the terms of the agreement[.]" *Id.* § 3; *see also Smith v. Spizzirri*, 601 U.S. 472, 478-79 (2024) (explaining that a district court must stay proceedings upon granting a motion to compel arbitration).

There is a strong federal policy in favor of arbitration. *See, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011); *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009). Arbitration agreements are placed "on equal footing with other contracts," *Concepcion*, 563 U.S. at 339, and courts are to "rigorously enforce" arbitration agreements "according to their terms." *Am. Express Co., v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013); *see also Clymer*, 334 F. Supp. 3d at 689-90. This extends to the parties' ability to delegate "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

In light of these principles, a district court's review of a motion to compel arbitration is narrow. Where, as here, the parties "delegate[] threshold arbitrability questions to the arbitrator," courts "may not override" that choice, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019), and a district court's review is limited to the question of whether "a valid agreement to arbitrate exists," *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005); *see also Kirkham v. TaxAct, Inc.*, No. 23-3303, 2024 WL 1143481, at *4 (E.D. Pa. Mar. 15, 2024) (explaining that a delegation clause "considerably narrows" the scope of issues on which a reviewing court may pass). Put another way, the FAA's express language "leaves no place for the exercise of discretion[.]" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). A district court must enforce the parties' agreement and stay litigation pending conclusion of the arbitration. *See Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3d Cir. 2004); *Mack v. Progressive Corp.*, No. 23-2430, 2024 WL 1120377, at *6 (E.D. Pa. Mar. 14, 2024).

**B. The Parties Entered into Valid Agreements to Arbitrate this Dispute**

To determine whether there is an agreement to arbitrate, courts "turn to ordinary state-law principles that govern the formation of contracts." *Kirleis*, 560 F.3d at 160 (internal quotation marks and citation omitted). In this case, as explained more fully below, the parties agreed that North Carolina law applied to "all matters relating to . . . access to or use of [Labcorp's] Online Services," Ex. P (December 2019 Terms and Conditions) § 21; Ex. Q (December 2022 Terms and Conditions) § 22; Ex. S (May 2023 Terms and Conditions) § 23, and that choice-of-law provision was part of the agreements Plaintiffs entered into when they created Labcorp Patient accounts, *see, e.g.*, *Kirkham*, 2024 WL 1143481, at *6-9 (applying Texas law to issue of contract formation where "clickwrap" agreement's choice-of-law provision incorporated Texas law). "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions." *Gay v.*

*CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (internal quotation marks and citation omitted); *see also Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (noting that Pennsylvania courts "generally . . . enforce choice of law provisions"). And that especially makes sense here, where North Carolina is the home state of one of the parties to the agreements. *See* Compl. ¶ 12 (alleging Labcorp is headquartered in Burlington, North Carolina); *ABEC, Inc. v. Eat Just, Inc.*, No. 23-1091, 2023 WL 8845237, at *5 n.9 (E.D. Pa. Dec. 21, 2023) (enforcing choice-of-law provision incorporating law of state where one party to the agreement was incorporated). The result of applying North Carolina law is clear: Plaintiffs have a contractual obligation to arbitrate this dispute.[5]

To be enforceable, "'a contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms.'" *Brown v. Fam. Dollar Stores of N.C., Inc.*, No. 1:21CV977, 2022 WL 3576972, at *2 (M.D.N.C. Aug. 19, 2022) (citation omitted); *see also Matthews*, 2022 WL 462406, at *6 (similar). "Consistent with federal policy," the law favors arbitration and instructs that "any doubt concerning the existence of [an arbitration] agreement must also be resolved in favor of arbitration." *Brown*, 2022 WL 3576972, at *2 (quoting *Johnston Cnty. v. R.N. Rouse & Co.*, 414 S.E.2d 30, 32 (N.C. 1992) (alteration in *Brown*)); *see also Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1096 (Pa. Super. Ct. 2015) ("Pennsylvania law endorses the nationally liberal policy favoring arbitration embodied in the Federal Arbitration Act[.]"); *Bloch v. Bloch*, 693 A.2d

[5] The result is the same if the law of Pennsylvania or Maryland applied to the issue of contract formation. As relevant here, each provides that a contract is formed upon "'(1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration.'" *Matthews v. Gucci*, No. 21-434-KSM, 2022 WL 462406, at *6 (E.D. Pa. Feb. 15, 2022) (citation omitted); *see also Allegis Grp., Inc. v. Bero*, 689 F. Supp. 3d 81, 116 (D. Md. 2023) (Maryland law); *T.M.C.S., Inc. v. Marco Contractors, Inc.*, 780 S.E.2d 588, 593 (N.C. Ct. App. 2015) (comparison of Pennsylvania and North Carolina law). And where there is no conflict between the potentially applicable state laws with respect to the issue of contract formation, "the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006).

364, 367 (Md. Ct. Spec. App. 1997) (explaining that "all doubts" regarding the enforceability of an arbitration provision "are to be resolved in favor of submitting the dispute to arbitration").

Further, "[t]he internet has 'not fundamentally changed'" the law of contract formation. *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 483 (9th Cir. 2020) (citation omitted). Online agreements are valid and enforceable so long as the parties "assent to the same thing in the same sense, and their minds meet as to all terms." *Dillon v. BMO Harris Bank, N.A.*, 173 F. Supp. 3d 258, 263 (M.D.N.C. 2016) (internal quotation marks and citation omitted). It is of no moment whether an internet user "has not actually read the terms of an agreement," so long as he or she was "required to acknowledge an agreement to proceed[.]" *Moreno v. Expedia*, No. 3:18-CV-105, 2018 WL 3059617, at *3 (W.D.N.C. June 20, 2018); *see also Broomall Operating Co. LP v. Eldridge*, No. 20-2168, 2021 WL 3910723, at *6 (E.D. Pa. Aug. 31, 2021) ("Pennsylvania courts have unwaveringly held that failure to read a contract is not a defense to its enforcement."); *Ratliff v. CoStar Realty Info., Inc.*, No. 11-0813, 2011 WL 2680585, at *6 (D. Md. July 7, 2011) ("In Maryland, the 'general rule' is that when one signs a release or other instrument, [s]he is presumed in law to have read and understood its contents.") (citation omitted). Evidence of a party's "constructive knowledge" of the agreement's terms suffices. *Bergenstock v. LegalZoom.com, Inc.*, No. 13 CVS 15686, 2015 WL 3866703, at *5 (N.C. Super. Ct. June 23, 2015); *see also Pickett v. Lyft, Inc.*, No. 20-6389, 2022 WL 1557667, at *6 (E.D. Pa. May 16, 2022) (explaining that mutual assent turns "on a reasonable person's understanding of the parties' intent 'given their objective manifestations,'" not their "'undisclosed and subjective intentions'") (citation omitted); *Ratliff*, 2011 WL 2680585, at *6 (similar).

In other words, "an offeree [will be] bound by an arbitration clause if 'a reasonably prudent Internet consumer'" would be put on inquiry notice' of the 'agreement's existence and contents.'"

*Dohrmann*, 823 F. App'x at 483 (citation omitted); *see also Hine v. LendingClub Corp.*, 2:22-CV-00362-CRE, 2023 WL 8113234, at *7 (W.D. Pa. Nov. 22, 2023) (under Pennsylvania law, a plaintiff is put on notice of arbitration provision contained in a clickwrap agreement where "a reasonably prudent Internet user would have seen [it]") (internal quotation marks and citation omitted); *Lyles v. Chegg, Inc.*, No. RDB-19-3235, 2020 WL 1985043, at *3 (D. Md. Apr. 27, 2020) (similar under Maryland law).

Here, Plaintiffs agreed to arbitrate disputes with Labcorp when they created their respective accounts. In creating accounts, Plaintiffs checked a box affirming they had read, understood, and agreed to the accompanying, hyperlinked policies, including the User Agreement. *See* Crozier Decl. ¶¶ 10-11; Ex. I (December 28, 2019 Registration Page); Ex. J (January 12, 2022 Registration Page).[6] Only after agreeing to these terms could Plaintiffs complete the account registration process via the "Create Account" button. *See* Crozier Decl. ¶¶ 10-11. By taking these steps, Plaintiffs manifested their assent to the User Agreement, which obligated them to bring "any dispute, claim or controversy arising out of or relating in any way to this agreement or the patient portal" in "binding arbitration under the consumer arbitration rules of the American Arbitration Association," Ex. M (December 28, 2019 User Agreement) § 14; Ex. N (January 12, 2022 User Agreement) § 14, and incorporated the choice-of-law provision selecting North Carolina law, *see* Ex. P (December 28, 2019 Terms and Conditions) § 21; Ex. Q (January 12, 2022 Terms and Conditions) § 22.

"[C]lickwrap agreement[s]" such as this one are routinely enforced where users can "only proceed after acknowledging [the hyperlinked] terms." *Bergenstock*, 2015 WL 3866703, at *6;

[6] Plaintiff Stevens also was presented with the same hyperlinks when she scheduled an appointment after February 2022 and, once again, manifested her assent to the User Agreement. *See* Crozier Decl. ¶¶ 12-13; Ex. K (Stevens Appointment Log); Ex. L (Screenshots of Appointment Scheduling Process).

*see also Moreno*, 2018 WL 3059617, at *3 ("[O]nline consumer agreements are valid and enforceable when a user affirmatively acknowledges and agrees to contractual terms by checking a box or clicking a button as a condition of proceeding with his transaction."); *Corpening v. MoneyLion Inc.*, No. 3:19-cv-00282-FDW-DSC, 2020 WL 13882091, at *4-5 (W.D.N.C. Apr. 22, 2020) (enforcing arbitration provision where "Plaintiff was required to manifest assent to prior to using Defendants' product, and was not allowed to use the App until he agreed"); *accord Defillipis v. Dell Fin. Servs.*, No. 3:14-CV-00115, 2014 WL 4198015, at *6 (M.D. Pa. Aug. 22, 2014) ("Clickwrap agreements are increasingly common and 'have routinely been upheld.'") (citation omitted).

Courts in this District, including this one, have enforced agreements substantially similar to the one here, holding that the clickwrap process puts users on "sufficiently conspicuous notice" of the website's hyperlinked terms. *Kirkham*, 2024 WL 1143481, at *8. In *Kirkham*, for example, the plaintiff was required to "check a box indicating" that he agreed to the defendant's applicable policies, which appeared on an "uncluttered screen" and were "marked in blue" to indicate that they contained a clickable hyperlink. 2024 WL 1143481, at *8. Similarly, in *Caimano v. H&R Block*, the court found that plaintiffs had reasonable notice of and "assented to the Online Services Agreement by clicking the 'check box' acknowledgment and proceeding through the online tax preparation platform." No. 23-3272, 2024 WL 3295589, at *11 (E.D. Pa. July 3, 2024) (citation omitted). These same facts are present in this case, and it follows that Plaintiffs also were given "reasonable notice of the [User Agreement], and [they] assented to the arbitration agreement contained therein." *Kirkham*, 2024 WL 1143481, at *9; *see also Dobbs v. HealthIQ Insur. Servs., Inc.*, No. 21-5276, 2022 WL 2974713, at *4-5 (E.D. Pa. July 27, 2022) (enforcing arbitration provision in a clickwrap agreement); *Moreno*, 2018 WL 3059617, at *3 (same).

Plaintiffs reaffirmed their agreement to arbitrate this suit, and indeed "any dispute" with Labcorp, Ex. R (Updated Agreement) § 13, when they were presented with the Updated Agreement and continued to use Labcorp Patient. *See* Crozier Decl. ¶¶ 14-22. When the Updated Agreement was published to the Website, Labcorp communicated this change to Plaintiffs by deploying a Pop-Up that appeared the next time they logged into their accounts. *Id.* ¶ 19. The Pop-Up advised in plain terms that changes had been made to each Plaintiff's agreement with Labcorp, which they could review by clicking on the "Review Agreement" button. *Id.*; *see* Ex. T (Pop-Up Representation). Plaintiffs could not use Labcorp Patient until they either navigated to the Updated Agreement or, if they elected to do so, closed the Pop-Up. Crozier Decl. ¶ 19. This process was consistent with the change-of-terms provision in the User Agreement, which stated that Labcorp could amend the User Agreement, effective "upon providing notice of the changes" to account holders when they accessed their accounts. Ex. M (December 28, 2019 User Agreement) § 3; Ex. N (January 12, 2022 User Agreement) § 3.

Courts regularly enforce such modifications issued pursuant to change-of-terms provisions like the one at issue here. The recent decision of the Supreme Court of North Carolina in *Canteen v. Charlotte Metro Credit Union*, 900 S.E.2d 890 (N.C. 2024) is particularly instructive.[7] In that case, a customer entered into an agreement with a credit union to open an account, and the agreement contained a change-of-terms provision similar to the one at issue here. *Id.* at 892-93. Years later, the credit union amended the agreement to require—for the first time—that the parties

[7] As explained above, the parties agreed in the User Agreement (and the Terms and Conditions it incorporated) that North Carolina law governs their dispute, *see* Ex. P (December 2019 Terms and Conditions) § 21; Ex. Q (December 2022 Terms and Conditions) § 22; Ex. S (May 2023 Terms and Conditions) § 23, and "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Gay*, 511 F.3d at 389 (internal quotation marks and citation omitted); *accord Keena v. Groupon, Inc.*, 192 F. Supp. 3d 630, 634 (W.D.N.C. 2016) (applying Illinois law to motion to compel arbitration consistent with choice-of-law provision in operative agreement).

arbitrate any disputes and sent the customer an email describing the amendment. *Id.* at 893. The North Carolina Supreme Court held that the arbitration provision was enforceable. *Id.* at 896-97. It explained that where a change-of-terms provision applies, "the traditional modification analysis which requires mutual assent and consideration does not apply[.]" *Id.* at 894. Instead, an amendment made pursuant to a change-of-terms provision is enforceable so long as it "relate[s] to the same universe of terms as the original agreement." *Id.* at 896. The initial agreement in *Canteen* included a "'Governing Law'" provision, which contained forum-selection and choice-of-law clauses. *Id.* Thus, the arbitration provision fell "within the same universe" as the Governing Law provision, because it "simply changed the forum in which the parties could raise certain disputes." *Id.* at 897. That finding was dispositive, because the amendment was enforceable "upon notice to [the plaintiff]," without requiring a showing of "consent." *Id.* at 898.

The North Carolina Supreme Court's reasoning applies with even more force here. The relationship between the amendment in this case and the "universe of terms" discussed by the User Agreement is closer than the relationship at issue in *Canteen. Id.* The *Canteen* Court enforced an amendment that inserted an arbitration provision into an agreement where none existed before. *Id.* at 896-97. Here, by contrast, the Updated Agreement simply modified the parties' ***existing*** arbitration obligations. *See* Ex. M (December 28, 2019 User Agreement) § 14; Ex. N (January 12, 2022 User Agreement) § 14; Ex. R (Updated Agreement) § 13.

Further, Plaintiffs were given notice of the Updated Agreement via the Pop-Up when they accessed their accounts for the first time after publication of the Updated Agreement. *See* Crozier Decl. ¶ 15. Plaintiffs also manifested their assent to and provided consideration for these modified terms by continuing to interact with Labcorp Patient after the Pop-Up had been presented to them. *See id.* ¶¶ 20-22; Ex. C (Stevens Database Log); Ex. D (Wiggins Database Log). Indeed, Plaintiffs'

accounts have remained active. Crozier Decl. ¶ 22. That is more than sufficient as a matter of law. *See Canteen,* 900 S.E.2d at 898.

Even if formal assent and consideration were required to enforce modified terms, courts have endorsed mechanisms for updating agreements similar to the one Labcorp employed, holding that a user's continued use of a website after receiving notice of the amendment manifests the user's assent to and consideration for the same. *See, e.g.*, *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 549-50 (S.D.N.Y. 2018) (enforcing modifications to user agreements presented to users when they accessed their accounts after they continued to use the defendant's service); *Kai Peng v. Uber Tech., Inc.*, 237 F. Supp. 3d 36, 51-52 (E.D.N.Y. 2017) (same); *Li v. Georges Media Grp., LLC*, No. 23-1117, 2024 WL 1550368, at *1, *4 (E.D. La. Mar. 7, 2024) (same). The same conclusion is warranted here: Plaintiffs entered into valid agreements to arbitrate, and this Court should order Plaintiffs to comply with these agreements.

### C. Any Dispute About the Scope of the Parties' Agreements to Arbitrate Is for the Arbitrator

Finding that valid arbitration agreements exist resolves this Motion because Labcorp and Plaintiffs delegated to an arbitrator any questions regarding the scope of their agreements by incorporating the AAA Rules. The Third Circuit has joined numerous appellate courts in holding that "'incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent [to delegate arbitrability].'" *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 104 (3d Cir. 2020) (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1130-131 (9th Cir. 2015) (alterations in *Richardson*)). "Incorporation by reference to . . . AAA rules is sufficient because . . . [the] AAA have rules pertaining to their jurisdiction and how they shall have the power to decide issues of arbitrability." *Deardorff v. Cellular Sales of Knoxville, Inc.*, No. 19-2642-KSM, 2022 WL 407396, at *9 (E.D. Pa. Feb. 9, 2022); *see also Sarah Car Care, Inc. v. LogistiCare*

*Sols.*, LLC, No. 21-1761, 2024 WL 100199, at *6 (E.D. Pa. Jan. 9, 2024); *Iezzi v. CrossCountry Mortg., LLC*, No. 23-2827, 2024 WL 37951, at *6 (E.D. Pa. Jan. 3, 2024).

Both the User Agreement and Updated Agreement expressly incorporated the AAA Rules, which delegate questions of arbitrability to the arbitrator. *See* Ex. M (December 28, 2019 User Agreement) § 14 (providing that parties' disputes shall be resolved "by binding arbitration administered by the American Arbitration Association [] under its Consumer Arbitration Rules "); Ex. N (January 12, 2022 User Agreement) § 14 (same); Ex. R (Updated Agreement) § 13 (same). Under these Rules, the arbitrator is empowered "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Ex. O (AAA Rules), R-14(a). That ends the inquiry. The Motion should be granted, leaving any questions about the scope of the agreements to the arbitrator.

Even if the Court were to assess arbitrability, the outcome would not change. This dispute falls well within the ambit of the parties' arbitration agreements, particularly given the federal policy in favor of arbitration. *Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291, 295 (3d Cir. 2016) ("'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'") (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). The Updated Agreement leaves no ambiguity. With exceptions for employment-related claims, wrongful death or personal injury suits, and intellectual property actions, it applies to "any dispute, claim, or controversy [arising] between [Labcorp and Plaintiffs], including any past, currently pending, existing, or future dispute or disagreement." Ex. R (Updated Agreement) § 13. Because the Complaint does not fall into any of the discrete exceptions, this suit is clearly subject to arbitration.

The same conclusion follows if the Court were to put aside the Updated Agreement and look only at the User Agreement. The User Agreement governs "any dispute, claim or controversy arising out of or relating in any way to this agreement or the patient portal." Ex. M (December 28, 2019 User Agreement) § 14; *see* Ex. N (January 12, 2022 User Agreement) § 14 (same). "Arbitration provisions" that "contain the phrase 'arising out of' are construed broadly." *Bedell v. Carrow*, No. 20-3804, 2021 WL 229319, at *3 (E.D. Pa. Jan. 22, 2021) (citation omitted); *see also Zeller-Landau v. Sterne Agee CRT, LLC*, No. 17-3962, 2018 WL 334970, at *6 (E.D. Pa. Jan. 9, 2018) (describing similar language as "broad"). And here, Plaintiffs' claims arise out of and relate to alleged collection and transmission of information regarding Labcorp patients' use of the Website on the theory that this information amounts to protected health information. *See, e.g.*, Compl. ¶¶ 1-3, 8, 43-45, 49-53. Plaintiffs allege that Labcorp used certain analytics technologies to "intercept[ ]" their "interactions of logging into Labcorp's patient portal," *id.* ¶¶ 70, 76, focusing on how Website users allegedly access Labcorp Patient accounts to schedule appointments and view test results, *id.* ¶¶ 43-53, 70, 76. Both Plaintiffs allege that they did just that. *Id.* ¶¶ 71, 77 (citing *id.* ¶¶ 43-53).

In particular, both Plaintiffs allege that they used the Website to view their test results between early 2022 and March 8, 2023, *id.* ¶¶ 70, 76, which could ***only*** be done through Labcorp Patient. *See* Crozier Decl. ¶¶ 2, 5. Labcorp's records are consistent with these allegations and show that Plaintiff Stevens accessed her Labcorp Patient account and viewed test results on multiple occasions between February 2022 and November 2022. *See* Ex. C (Stevens Data Base Log). Likewise, Labcorp's records confirm that Plaintiff Wiggins accessed his Labcorp Patient account and viewed tested results in January 2022. *See* Ex. D (Wiggins Database Log).

Thus, irrespective of which version of the arbitration provision the Court considers, Plaintiffs' claims are covered. *See Kirkham*, 2024 WL 1143481, at *2, *8-9 (compelling arbitration of claims challenging defendant's use of third-party analytics technologies in light of agreement that required arbitration of all disputes "arising out of or related to these Terms or our Services"); *Caimano*, 2024 WL 3295589, at *16-17 (similar).

### D. Enforcing the Arbitration Agreements Requires a Stay of Proceedings

Because Plaintiffs' claims should be submitted to individual arbitration, this case should be stayed pending the resolution of those proceedings. *See Smith*, 601 U.S. at 478-79. Where a valid arbitration agreement exists, the FAA's direction is clear: the court "'***shall*** . . . stay the trial of the action[.]'" *Kirkham*, 2024 WL 1143481, at *13 (emphasis added; quoting 9 U.S.C. § 3); *see also Lloyd*, 369 F.3d at 269 (holding that a district court is "obligated under [the FAA] to grant the stay once it decide[s] to order arbitration"). The Court should stay this case pending the conclusion of arbitration proceedings.

## CONCLUSION

In light of the foregoing, Labcorp respectfully requests that the Court issue an order granting the Motion, compelling arbitration, and staying this action pending the completion of individual arbitration proceedings.

Respectfully submitted,

Date: July 26, 2024

*/s/ Jasmeet K. Ahuja*

Jasmeet K. Ahuja (PA Bar No. 332093)
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
Telephone: (267) 675-4667
Fax: (267) 675-4601
Email: jasmeet.ahuja@hoganlovells.com

Allison Holt Ryan (*pro hac vice*)
Adam A. Cooke (*pro hac vice*)
Aidan J. Coleman (*pro hac vice*)
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email: allison.holt-ryan@hoganlovells.com
Email: adam.a.cooke@hoganlovells.com
Email: aidan.coleman@hoganlovells.com

*Counsel for Defendant Laboratory Corporation of America Holdings*

**CERTIFICATE OF SERVICE**

I hereby certify on July 26, 2024 the foregoing Motion to Compel Arbitration and Stay Proceedings was filed and served electronically on counsel of record. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja