**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MICHAEL WIGGINS AND TERI STEVENS,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | |
| | **NO. 24-0648** |
| **LABORATORY CORPORATION OF AMERICA HOLDINGS,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Michael Wiggins and Teri Stevens have sued the healthcare company Laboratory Corporations of America Holdings ("LabCorp"), alleging on behalf of a putative class of similarly situated customers that LabCorp shared sensitive patient health information with Google in violation of, *inter alia*, the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et. seq.* Relying on the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 *et seq.*, LabCorp now moves to compel individual arbitration and stay this action pending the outcome of those proceedings. For the reasons that follow, LabCorp's Motion will be granted.

## I.     BACKGROUND

### A.     Plaintiffs' Interactions with LabCorp's Website

LabCorp is a provider of clinical laboratory services headquartered in Burlington, North Carolina. The company offers a patient portal on its website, which enables users to, among other things, schedule medical tests, review the results of those tests, and pay bills. To receive access to the patient portal, users must first register on LabCorp's website and provide certain information, such as their name, date of birth, mailing address, phone number, and email address. Users must also check a box towards the bottom of the registration screen (underneath a heading marked "Authorization") affirming that they "have read, understand and agree to the LabCorp

Terms of Use and Web Privacy Statement." This affirmation appears in text adjacent to the checkbox. As of 2019, the phrases "Terms of Use" and "Web Privacy Statement" are written in blue text—which stands in contrast to the white background and surrounding black text on the rest of the account registration screen—and are designed to operate as clickable hyperlinks that take the user to the relevant document.

Stevens and Wiggins created accounts on the LabCorp patient portal in 2019 and 2022 respectively and, in doing so, checked the box in the "Authorization" section. However, they did not: (1) read the text adjacent to the checkbox, which they characterize as "tiny" and "barely legible"; (2) attempt to click the phrases written in blue text to determine whether they were functioning hyperlinks; (3) read any of the provisions that may have appeared on the landing pages associated with those hyperlinks; or, (4) understand what any of it meant. Rather, they "just checked these boxes because that's what everyone knows you have to do to get to the next page on a website."

Plaintiffs describe a similar interface with a pop-up window on the patient portal in May 2023. At the time they and other users logged into the patient portal for the first time the system displayed a pop-up window alerting them of an "IMPORTANT UPDATE" related to "Changes to [LabCorp's] Patient Portal User Agreement." Immediately below this text, LabCorp informed users that it had "recently updated [its] Patient Portal User Agreement," which they could review at "anytime on [its] website." At the bottom of the pop-up window, there was a blue oblong button with the text, "Review Agreement," written in white typeface. The button was designed to operate as a clickable hyperlink that would take the user to the agreement. Alternatively, users could close the pop-up window by clicking the "X" in the top-right corner, which is what

Plaintiffs concede they did after being confronted with the alert.[1]

### B.    The Terms of Use

LabCorp states that the "Terms of Use" hyperlink on the account registration screen was designed to direct users to its then-operative user agreement (the "User Agreement"). Both iterations of the User Agreement that were in effect when Wiggins and Stevens registered for the patient portal provided that users "agree to be bound by this agreement when you click 'I agree' and/or continue to access or use the Patient Portal. If you do not understand or agree to be bound by this agreement, do not access or use the Patient Portal."

Among the terms laid out in the User Agreement is a mandatory arbitration provision, which users are advised, in bold, "requires the use of arbitration on an individual basis and limits the remedies available to you in the event of disputes or claims in connection with this Agreement or the Patient Portal." Specifically, the arbitration provision, which is included in all capital letters, states that "any dispute, claim or controversy arising out of or relating in anyway to this Agreement or the Patient Portal shall be finally decided by binding arbitration under the Consumer Arbitration Rules of the American Arbitration Association [the "AAA Rules"]." The AAA Rules, in turn, empower the arbitrator to, among other things: (1) "rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim"; and, (2) "determine the existence or validity of a contract of which an arbitration clause forms a part."

Additionally, the User Agreement included a class action waiver, which stated that the

---

[1] In their respective declarations, Wiggins and Stevens both aver that they "do not remember seeing this pop-up box, clicking any button in it, or reviewing any agreement it might have linked to" and did not understand that by "clicking the 'X' to close the window meant they were agreeing to anything." Nonetheless, they acknowledge that they "know now that the pop-up box had an 'X' at the top right corner to close it out" and are "confident that this is what [they] did because that is what everyone knows you do to close a pop-up window." Any ambiguity in Plaintiffs' actions with respect to closing the pop-up window is clarified in a subsequent section when they both admit to having "just clicked the 'X' to close the pop-up box."

3

parties "may bring claims against the other only in your or its individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding."  It also set forth a change-of-terms provision advising users that LabCorp "may, at any time and from time to time, supplement, amend, or otherwise change this Agreement."

Finally, the User Agreement contained an integration clause, providing that "[t]his Agreement, the Terms and Conditions, and any other policies or notices referenced herein, represent the entire agreement of the parties with respect to the subject matter hereof."  Given that various provisions of the User Agreement are "incorporated herein via hyperlink," users agree that "if at the time of accepting this Agreement such hyperlinks do not redirect you to the appropriate web page, you will notify LabCorp immediately" via email.  "Failure to notify LabCorp immediately shall be deemed as acceptance of the provisions incorporated herein by hyperlink as though they redirected you to the appropriate webpage."

On May 9, 2023, LabCorp issued a modified version of the User Agreement (the "Modified Agreement") and alerted users through the pop-up window described above.  The Modified Agreement included a near-identical arbitration provision and class action waiver, which, in relevant part, reads as follows:

> **Arbitration Agreement.** You and LabCorp mutually agree, to the fullest extent of the law, that any Dispute (defined below) shall be arbitrated and finally decided by binding arbitration administered by the American Arbitration Association . . . under its Consumer Arbitration Rules . . . except as modified below or otherwise agreed to.  As used in this Arbitration Agreement, "Dispute" means any dispute, claim, or controversy between us, including any past, currently pending, existing, or future dispute or disagreement, except: (a) claims by employees of LabCorp entities related to the terms or conditions of their employment; (b) claims for personal physical injury or wrongful death or survival claims arising from or in any way related to clinical laboratory services; and (c) claims for unlawful use of copyrights, trademarks, trade names, logos, trade secrets, or patents.  You and LabCorp agree that you are each giving up, to the fullest extent of the law, any right to have disputes resolved in court before a judge and jury.

4

**Class Action Waiver.** You and LabCorp also mutually agree that, to the fullest extent allowed by law, and except as expressly set out below, each may bring claims against the other only in your or its individual capacity, on an individual basis, and not as a plaintiff or class member in any purported class, collective, nonindividual, mass, or representative proceeding.

### C.   Procedural Background

Shortly after Plaintiffs filed their Complaint, LabCorp moved to compel arbitration and stay this case pending arbitration.  In its motion, LabCorp pointed to the arbitration provision in the User Agreement, which it maintains governs Plaintiffs' LabCorp patient portal accounts, arguing that Plaintiffs entered into valid arbitration agreements with LabCorp when they successfully registered for online accounts.  Because that registration process required Plaintiffs to check the box affirming that they "have read, understand and agree to the LabCorp Terms of Use and Web Privacy Statement," LabCorp maintained that Plaintiffs assented to the terms contained therein.  Separately, LabCorp asserted that the arbitration provision incorporated the AAA Rules such that any dispute as to the scope of the parties' agreement to arbitrate must be delegated to an arbitrator.

The Court denied LabCorp's motion without prejudice and allowed Plaintiffs to conduct limited discovery regarding: (1) "[t]he issue of whether this matter must be submitted for arbitration"; and, (2) "[a]ny jurisdictional issues that will be raised by the parties."  Upon completion of discovery, LabCorp renewed its Motion to Compel Arbitration and Stay Proceedings, which Motion is now before the Court.

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity,"  9 U.S.C. § 2.  "A party aggrieved by the alleged

failure . . . of another to arbitrate . . . may petition any United States district court which, save for

such agreement, would have jurisdiction . . . for an order directing that such arbitration proceed

in the manner provided for in such agreement." *Id.* § 4.

The FAA "reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'"

*KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (quoting *Mitsubishi Motors Corp.*

*v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)); *accord Moses H. Cone Mem'l*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (acknowledging the "liberal federal

policy favoring arbitration agreements, notwithstanding any state substantive or procedural

policies to the contrary").  Pursuant to that "liberal" policy, "courts must place arbitration

agreements on an equal footing with other contracts . . . and enforce them according to their

terms."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted).

This principle also reaches delegation clauses—agreements to arbitrate "'gateway'

questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their

agreement covers a particular controversy," *Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S. 63, 68-69

(2010) (citations omitted)—so long as there is "'clear and unmistakable' evidence of the parties'

intent" to delegate.  *Richardson v. Coverall N. Am., Inc.*, 811 Fed. App'x 100, 103 (3d Cir. 2020)

(quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  That is because

"[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the

party seeking arbitration asks the federal court to enforce, and the FAA operates on this

additional arbitration agreement just as it does on any other."  *Rent-A-Ctr.*, 561 U.S. at 69.

Nonetheless, "a party cannot be compelled to submit a dispute to arbitration unless it has

agreed to do so."  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513,

524 (3d Cir. 2009).  "[I]n deciding whether a party may be compelled to arbitrate under the FAA,

[courts] first consider (1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (internal quotation marks omitted).

The evaluation of this Motion is led by the summary judgment standard found in Federal Rule of Civil Procedure 56 such that LabCorp's motion will be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A genuine issue is present when a reasonable trier of fact, viewing all record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986)). "Material facts are those that could affect the outcome of the proceeding." *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011). In making these determinations, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. The non-moving party, however, "may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citation omitted).

### III.    DISCUSSION

#### A.    The Court's Review is Limited by the Delegation Clause

Plaintiffs rely heavily on this Court's opinion in *Kirkham v. TaxAct, Inc.*, 2024 WL

1143481, at \*2-4 (E.D. Pa. Mar. 15, 2024) to argue that the User Agreement and Modified

Agreement do not require that this matter be arbitrated.  As a threshold issue, they read *TaxAct* to

preclude the delegation of gateway questions of arbitrability to an arbitrator unless the arbitration

provision in the operative agreement explicitly states that the rules of organizations such as the

AAA or the Judicial Arbitration and Mediations Services ("JAMS") are "incorporated by

reference."  *See id.* at \*2, 4 (finding that an arbitration provision "incorporate[d] the JAMS rules

in full," which, in turn, limited the Court's review of gateway issues of arbitrability, where the

provision stated that all disputes "be resolved through confidential binding arbitration . . . in

accordance with the Streamlined Arbitration Rules and Procedures . . . of [JAMS], which are . . .

*hereby incorporated by reference*" (emphasis in original)).

Applying this purported principle from *TaxAct*, Plaintiffs submit that because the

arbitration provisions at issue here do not specifically use the phrase, "incorporated by

reference," but rather mandate that all disputes within the scope of the agreements "shall be

finally decided by binding arbitration *under* the Consumer Arbitration Rules of the American

Arbitration Association," LabCorp has not used the  right "magic words"—"incorporated by

reference"—to effectuate the delegation and, thus, its Motion should be denied.  However,

nothing in *TaxAct* is so limiting.  Rather, all delegation requires is "'clear and unmistakable'

evidence of the parties' intent," *see Richardson*, 811 Fed. App'x at 103, which several courts

have found when the operative provision explicitly references the applicability of the AAA or

JAMS rules.  *See, e.g.*, *Deardorff v. Cellular Sales of Knoxville, Inc.*, 2022 WL 407396, at \*10

(E.D. Pa. Feb. 9, 2022) (agreement providing that all disputes "shall be resolved exclusively by

final and binding arbitration administered by JAMS under its Employment Arbitration Rules &

Procedures" was "about as clear and unmistakable as language can get" (citation omitted)); *Iezzi*

8

*v. CrossCountry Mortg., LLC*, 2024 WL 37951, at *3 (E.D. Pa. Jan. 3, 2024) (same where the agreement required disputes be resolved "pursuant to [American Arbitration Association's] Employment Arbitration Rules and Mediation Procedures" (alterations in original)); *Dobbs v. Health IQ Ins. Servs., Inc.*, 2022 WL 2974713, at *5 (E.D. Pa. July 27, 2022) (same where the agreement required disputes be resolved "by the American Arbitration Association ("AAA") in accordance with the provisions of its Commercial Arbitration Rules" (alterations in original)).

Considering the above, the use of the word "under" to describe the applicability of the AAA Rules demonstrates that the arbitration provisions at issue "clearly and unmistakably" incorporate the AAA Rules in full. *See Richardson*, 811 Fed. App'x at 103. As a result, they also include the AAA Rules' delegation clause whereby the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

This provision considerably narrows, but does not eliminate, the Court's review of Plaintiffs' arguments. The FAA requires that, "*before* referring a dispute to an arbitrator, the court determine[] whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (emphasis added); *see* 9 U.S.C. § 4 (requiring district courts to compel arbitration only "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue"). At the same time, the FAA also instructs courts to enforce the terms to which the private parties have agreed. *Concepcion*, 563 U.S. at 339. The Supreme Court has held that this rule applies with equal force to delegation clauses even if, like the one at issue here, they provide that an arbitrator is to decide the validity or formation of an arbitration agreement. *Rent-A-Ctr.*, 561 U.S. at 68-72.

The Third Circuit resolved the obvious tension between these two principles in *MZM*

*Construction Company, Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386 (3d Cir. 2020). There, a construction company and a labor union had agreed to a "one-page, short-form agreement" to govern hiring for a project. *Id.* at 392. The agreement incorporated by reference a preexisting collective bargaining agreement, which included an arbitration agreement, which, in turn, included a delegation clause providing that "[t]he Arbitrator shall have the authority to decide whether an Agreement exists, where that is in dispute." *Id.* at 392-93. Following a disagreement regarding the construction company's compliance with certain payment obligations to the labor union's statewide benefit fund, the benefit fund unilaterally scheduled arbitration. *Id.* When the construction company sued to enjoin arbitration, it argued that there was fraud in the execution of the short-form agreement that incorporated by reference the collective bargaining agreement. *Id.* It followed, the construction company asserted, that the arbitration agreement contained therein (including the delegation clause) did not bind the company. *Id.*

The District Court found for the construction company and enjoined arbitration. *Id.* at 394. The Third Circuit affirmed, holding that, "unless the parties clearly and unmistakably agreed to arbitrate questions of contract formation in a contract *whose formation is not in issue,* those gateway questions are for the courts to decide," *id.* at 402 (emphasis added). There, the formation of an agreement to delegate arbitrability to an arbitrator was at issue because "[l]ack of assent to the container contract"—the employment agreement—"necessarily implicates the status of the arbitration agreement" and "the container contract and the arbitration provision depend on the same act"—formation of the employment agreement—"for their legal effect." *Id.* at 400 (citation omitted). "That is no less true when the container contract includes or incorporates a delegation provision." *Id.* (citation omitted).

Plaintiffs raise the same sort of arguments attacking the User Agreement and Modified Agreement here, asserting that they never formed an agreement to arbitrate with LabCorp because they never assented to its terms.[2]  This argument necessarily attacks both their agreement to the container contract (*i.e.*, the User Agreement and Modified Agreement) and the delegation clause contained therein, as the formation of these agreements "depend on the same act[s]" for their validity.  *Id.* (citation omitted).  Because they have placed "in issue" the "formation" of an agreement to delegate the issue of arbitrability to an arbitrator, *id.* at 402, whether Plaintiffs and LabCorp formed an agreement to arbitrate is properly before the Court.[3]

## B.     The Existence of a Valid Agreement to Arbitrate

Turning next to the issue of whether Plaintiffs assented to the User Agreement, and in turn, the arbitration provision and delegation clause contained therein, it is undisputed that Plaintiffs checked the box during the account registration process indicating that they "have read, understand and agree to the LabCorp Terms of Use and Web Privacy Statement."  However, the question remains whether, under these circumstances, that action was sufficient to bind them to the User Agreement.

---

[2] Although both parties agree that the class action waiver is a feature of the User Agreement, neither spend time to examining it further.  Accordingly, neither will the Court.  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . . . but not squarely argued, are considered waived.").

[3] On the other hand, Plaintiffs' additional arguments regarding the enforceability of the arbitration provision—that the User Agreement as a whole is procedurally and substantively unconscionable—are not properly before the Court.  "Under *Rent-a-Center* . . . unless a party specifically challenges the unconscionability of the delegation of the gateway issue of arbitrability to the arbitrator . . . this issue should be reserved for the arbitrator."  *Caruso v. J&M Windows, Inc.*, 2018 WL 4579691, at *4 (E.D. Pa. Sept. 24, 2018); *Rent-A-Ctr.*, 561 U.S. at 68-72.  Unlike their arguments attacking the formation of an agreement to arbitrate and the validity of the delegation clause, Plaintiffs' arguments regarding unconscionability are not specifically aimed at the delegation clause and speak more to enforceability more broadly.  *See generally Bowles v. OneMain Fin. Grp., LLC*, 954 F.3d 722, 725 (5th Cir. 2020) (treating a "procedural unconscionability objection" as going "to the enforceability of the Arbitration Agreement and not its formation"); Restatement (Second) of Contracts § 208 (Am. L. Inst. 1981) (describing unconscionability as a reason for "a court [to] refuse to enforce the contract," not a reason to hold that no contract was formed).  Thus, if the Court finds the User Agreement to be valid, any unconscionability issues should be decided by an arbitrator.

Because arbitration is a matter of contract, "[t]o determine whether the parties agreed to arbitrate, we turn to ordinary state-law principles that govern the formation of contracts." *Kirleis v. Dickie, McCamey & Chilcote*, *P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (internal quotation marks omitted).  Under North Carolina law,[4] "a valid contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms." *Charlotte Motor Speedway, LLC v. County of Cabarrus*, 748 S.E.2d 171, 176 (N.C. Ct. App. 2013); *see also Northington v. Michelotti*, 464 S.E.2d 711, 714 (N.C. Ct. App. 1995) ("It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement.").  "Consistent with federal policy, North Carolina likewise has a strong public policy favoring arbitration, such that 'any doubt concerning the existence of [an arbitration] agreement must also be resolved in favor of arbitration.'"  *Brown v. Fam. Dollar Stores of N. Carolina, Inc.*, 2022 WL 3576972, at *2 (M.D.N.C. Aug. 19, 2022) (quoting *Johnston County v. R.N. Rouse & Co.*, 414 S.E.2d 30, 32 (N.C. 1992)).

### i.    *Principles Governing Assent on the Internet*

A fundamental question in evaluating Plaintiffs' interactions with LabCorp's website is whether the User Agreement is characterized as a "clickwrap" or "browsewrap" agreement.

A "clickwrap agreement" is one whereby "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014)).  That process makes sure that customers "click on an acceptance *after* being presented with terms and

---

[4] Pennsylvania courts typically "honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them," *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994).  Thus, the Court will follow the choice-of-law provision in the User Agreement and apply North Carolina contract law.

conditions." *James v. Glob. TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017) (emphasis added).

"Provided that those terms and conditions are clearly presented, the 'clicking through' subjects

the user to the rule that where a benefit is offered subject to stated conditions, and the offeree

makes a decision to take the benefit with knowledge of the terms of the offer, the taking

constitutes an acceptance of the terms, which accordingly become binding on the offeree."

*Bergenstock v. LegalZoom.com, Inc.*, 2015 WL 3866703, at *5 (N.C. Super. June 23, 2015)

(internal quotation marks and citation omitted).

On the other hand, a "browsewrap agreement," in which "a website offers terms that are

disclosed only through a hyperlink and the user supposedly manifests assent to those terms

simply by continuing to use the website," is more suspect "because consumers are frequently left

unaware that contractual terms were even offered, much less that continued use of the website

will be deemed to manifest acceptance of those terms." *Berman*, 30 F.4th at 856 (citation

omitted). Because browsewrap agreements require little to no engagement with the terms before

a user assents, a website operator must demonstrate that the user either had "actual knowledge"

of the terms or was on inquiry notice of the same. *Id.* "[A]n enforceable contract will be found

based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice

of the terms to which the consumer will be bound; and (2) the consumer takes some action, such

as clicking a button or checking a box, that unambiguously manifests his or her assent to those

terms." *Id* (citations omitted)*.

"Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the

design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177

(citation omitted). For instance, courts have held that consumers are not on notice to terms and

conditions where the only reference to those terms is on a "submerged screen" located below the

registration button.  *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23, 32 (2d Cir. 2002)

("The sole reference to . . . [the] terms . . . was located in text that would have become visible to

plaintiffs only if they had scrolled down to the next screen."); *see also Hines v. Overstock.com*,

*Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009), *aff'd*, 380 Fed. App'x 22 (2d Cir. 2010)

(determining that a plaintiff was not on inquiry notice where she "could not even see the link to

[the terms and conditions] without scrolling down to the bottom of the screen—an action that

was not required to effectuate her purchase").  Notice "printed in a tiny gray font considerably

smaller than the font used in the surrounding website elements, and indeed in a font so small that

it is barely legible to the naked eye" will not suffice either.  *Berman*, 30 F.4th at 856-57.

"On the other hand, 'where the website contains an explicit textual notice that continued

use will act as a manifestation of the user's intent to be bound, courts have been more amenable

to enforcing browsewrap agreements.'"  *James*, 852 F.3d at 267 (quoting *Nguyen*, 763 F.3d at

1177).  Further, "disclos[ing] terms and conditions through a hyperlink" may put a user on

inquiry notice where the hyperlinked text is "clearly denote[d]" through design elements such as

capital letters, underscores, or contrasting font colors.  *Berman*, 30 F.4th at 857.

### ii.        *How to Characterize the User Agreement*

Here, LabCorp's website contains some hallmarks of both clickwrap and browsewrap

agreements.  On the one hand, to create an account, a user must check a box at the bottom of the

registration screen affirming that they "have read, understand and agree to the LabCorp Terms of

Use and Web Privacy Statement."  Traditional browsewrap agreements do not elicit this assent

from users.  *Id.* at 856.  On the other hand, the terms themselves never appear via pop-up

window; they must be accessed by affirmatively clicking the hyperlinked text.  With clickwrap

agreements, however, potential users "click on an acceptance *after* being presented with terms

and conditions," *James*, 852 F.3d at 267 (emphasis added).

14

###### iii.         *Plaintiffs Assented to the Terms of the User Agreement*

Nevertheless, there is no need to decide now how to characterize the User Agreement,

because even if analyzed under the more exacting "inquiry notice" standard applied to

browsewrap agreements—agreements that are inherently more "suspect" than clickwrap

agreements because users are often not required to meaningfully engage with the terms before

assenting, *see Berman*, 30 F.4th at 856—the User Agreement is enforceable against Plaintiffs.

*Cf. Fteja v. Facebook, Inc.*, 841 F. Supp.2d 829, 837 (S.D.N.Y. 2012) (treating Facebook's terms

of use as neither "a true browsewrap license" nor "a pure-form clickwrap agreement" and

applying a version of the inquiry notice standard).  Accordingly, to be bound by the User

Agreement, Plaintiffs: (1) must have received "reasonably conspicuous notice of the terms;" and,

(2) must have taken "some action, such as clicking a button or checking a box, that

unambiguously manifest[ed] his or her assent to those terms."  *Berman*, 30 F.4th at 856.

Because it is undisputed that both Wiggins and Stevens checked the box on LabCorp's website

agreeing to the terms of use, only the first element is at issue here.[5]  *Id.*

Upon review of the account registration page, it is apparent that LabCorp provided

Plaintiffs with sufficiently conspicuous notice of the terms and conditions contained in the User

Agreement for them to be bound.  As described above, to create an account, Plaintiffs had to

---

[5] Although Plaintiffs maintain that that they did not assent to the terms of the User Agreement because they did not: (1) "read the terms of use document"; (2) "understand what the terms of use document said or meant; or, (3) "agree to any of the terms of use," such arguments are unavailing under North Carolina law because they admit to having clicked the box when registering.  *See, e.g.*, *Carson v. LendingTree LLC*, 456 Fed. App'x 234, 236 (4th Cir. 2011) (finding that, under North Carolina law, "[Plaintiff] agreed to arbitrate the claims at issue" where she "affirmatively checked the box indicating that she agreed to the terms of use, which included the arbitration provision" even though she did not actually review those terms at the time of registration).

check a box indicating they "have read, understand and agree to the LabCorp Terms of Use and Web Privacy Statement." The text containing this affirmation is small but legible, is adjacent to the checkbox, and clearly indicates that checking the box constitutes assent to its terms. Further, the phrase "Terms of Use" is marked in blue text as typically indicates a hyperlink.[6]

Indeed "it is permissible to disclose terms and conditions through a hyperlink" when "the fact that a hyperlink is present [is] readily apparent." *Id*. at 857. Although it is a best practice to underline or capitalize the linked text to ensure that "it is sufficiently set apart from the surrounding text," highlighting it in a contrasting font color, as LabCorp did in blue, can help do that. *Id*. (internal quotation marks and citation omitted); *cf. Meyer v. Uber Techs., Inc.,* 868 F.3d 66, 77-78 (2d Cir. 2017) ("[A] reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found.").

By contrast, the notice provided here bears little in common with those previously found to be insufficient. The link to LabCorp's Terms of Service was not "in a tiny gray font considerably smaller than the font used in the surrounding website elements." *Berman*, 30 F.4th at 846; *see also Checchia v. SoLo Funds,* 2023 WL 3868369, at *9 (E.D. Pa. June 7, 2023) ("Significantly, 'Terms & Conditions' is not hyperlinked to the Terms, nor does it appear in any

---

[6] Plaintiffs contend that there is a genuine dispute as to whether this blue text indeed functioned as a hyperlink at the time they registered. However, LabCorp submitted the declaration of Lori Crozier, Strategic Product Leader for LabCorp's Patient Portal, who attests that "[t]he phrases 'Terms of Use' and 'Web Privacy Statement' are underlined and appear in distinct, blue font set off from the other text, indicating that they are clickable hyperlinks." She further attests that this hyperlink "was designed to take the user to" the User Agreement. Without more, Plaintiffs' argument that Crozier's testimony does not definitively prove whether the blue text was actually a hyperlink does not create a dispute of fact as they "may not rest upon mere allegations, general denials, or such vague statements" and instead must "set forth specific facts" in the record "showing a genuine issue for trial." *Quiroga v. Hasbro, Inc*., 934 F.2d 497, 500 (3d Cir. 1991). Since Plaintiffs have not done so, Crozier's statements regarding the functionality of the "Terms of Use" hyperlink are undisputed for purposes of the present motion. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"); *McNeil v. City of Easton*, 694 F. Supp.2d 375, 382 n.13 (E.D. Pa. 2010) (deeming facts undisputed where the party opposing summary judgment failed to file a statement of disputed facts).

special color, font, or format.").  Nor did it dangle a hyperlink to the Terms of Use before its users without requiring that they click a button manifesting their assent to the conditions contained therein.  *Nguyen*, 763 F.3d at 1178-79.  Rather, LabCorp included the checkbox underneath the final heading on the registration page in a section clearly marked "Authorization"—a practice the *Nguyen* court suggested can further reinforce a finding of constructive notice, *see id.* at 1178 (citing *PDC Lab'ys, Inc. v. Hach Co.,* 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009))—and placed the hyperlinked text adjacent to that button.  *See Hine v. LendingClub Corp.*, 2023 WL 8113234, at *7 (W.D. Pa. Nov. 22, 2023) (finding that hyperlinks "were readily apparent such that disclosing the arbitration provisions through the documents contained in the hyperlink was proper" where, among other things, the hyperlinked policies were "in immediate proximity to the electronic signature checkbox").

Plaintiffs thus received reasonable notice of the User Agreement, and accordingly assented to the terms contained therein, including the mandatory arbitration provision.

### iv.      *Plaintiffs Assented to the Terms of the Modified Agreement*

Having concluded that Plaintiffs assented to the User Agreement, the final issue is whether Plaintiffs also assented to the terms of the Modified Agreement.  The User Agreement contains a change-in-terms provision, which, in relevant part, states that LabCorp "may, at any time and from time to time, supplement, amend, or otherwise change this Agreement.  Any changes to this Agreement will be effective immediately upon providing notice of the changes to you either when you login to the Patient Portal or by sending notice niche changes to contact information that you have provided to us."  A user "agrees to comply with, and be bound by" a modified agreement either by (1) "continuing to use or access the Patient Portal after receiving notice of the changes as described above" or, (2) "not requesting to terminate [his or her] Patient Portal account within seven (7) calendar days after receiving a notice of the changes[.]"

Here, it is undisputed that Plaintiffs: (1) closed the pop-up window alerting users to "Changes to [LabCorp's] Patient Portal User Agreement" by clicking the "X" in the top-right corner of the window; and, (2) continued to use their respective accounts after receiving this notice.  Therefore, under the terms of the User Agreement, Plaintiffs' actions manifested their intent to be bound by the terms of the Modified Agreement, which also included a mandatory arbitration provision.

Further, under North Carolina law, "modifications made pursuant to change-of-terms provisions comply with the covenant of good faith and fair dealing"—which ensures that such provisions "do not provide carte blanche to parties seeking to modify agreements"—and are thus enforceable where the modifications are in the "same universe of terms as the original agreement" such that they "reasonably relate to subjects discussed and reasonably anticipated" in that agreement.  *Canteen v. Charlotte Metro Credit Union*, 900 S.E.2d 890, 896 (N.C. 2024).  In *Canteen*, the Supreme Court of North Carolina determined that an amendment to a membership agreement providing for mandatory arbitration was "within the same universe of terms" as the original agreement because the original agreement contained a "Governing Law" provision that "clearly contemplated the forum and method for dispute resolution between the parties."  *Id.* at 827 (providing that "the contract was subject to the laws of North Carolina, and that both parties agreed to bring any legal action regarding the contract in the county in which the credit union is located" (internal quotation marks omitted)).  Because the "Arbitration Amendment simply changed the forum in which the parties could raise certain disputes," the court found that it was "within the same universe of terms" as the original agreement.  *Id.*

Considering the above, the mandatory arbitration provision included in the Modified Agreement is well "within the same universe of terms" as the User Agreement given that

LabCorp included a nearly identical provision in the User Agreement.  Accordingly, leaving aside the issue of whether the modified provision is enforceable,[7] it is binding against Plaintiffs. *Id.* at 898.

## IV.   CONCLUSION

For these reasons, LabCorp's Motion to compel arbitration shall be granted and this action shall be stayed pending resolution of the arbitration proceedings.  *See* 9 U.S.C. § 3 ("[T]he court . . . upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement").

An appropriate order follows.

**BY THE COURT:**


___**/s/ WENDY BEETLESTONE**_____
**WENDY BEETLESTONE, J.**

---

[7] For the reasons described in Section III.A, issues of enforceability (*e.g.*, unconscionability) shall be decided by the arbitrator.